After an ore tenus proceeding, the Etowah County Circuit Court entered a judgment divorcing Ana M. Chambers ("the wife") and Clarence G. Chambers ("the *Page 710 
husband") on the basis of incompatibility of temperament. The divorce judgment contained a property division awarding the wife, among other things, the marital home (which had been appraised at $195,000 in 1999), all of the personal property in the marital home at the time of the divorce, three automobiles,[1] and $160,179 as alimony in gross (which the divorce judgment stated constituted one-half of the proceeds of a joint Merrill Lynch account, one-half of the funds in a SouthTrust Bank checking account in the husband's name only, and one-half of a certificate of deposit at SouthTrust Bank in the husband's name only (the "CD")).[2] The husband was awarded, among other things, a 1,040-acre farm, livestock (which included approximately 25 horses), and farm equipment; a car and a truck; his Prudential annuity (which was his retirement benefit from Eastern Airlines); one-half of the joint Merrill Lynch account; one-half of the certificate of deposit at SouthTrust Bank; and one-half of the SouthTrust checking account. The divorce judgment also awarded the husband his individual retirement account at Merrill Lynch ("Merrill Lynch IRA") and specifically divested the wife of any interest in that IRA. The husband was ordered to continue paying to Merrill Lynch Credit the amount of the monthly mortgage-debt payment on the marital home (i.e., $816.67 per month) as an incident of support and periodic alimony.[3]
The husband appeals, arguing that the C.D. was an individual retirement account and was his separate property so that it should not have been subject to division; that the C.D. no longer existed at the time of trial because, he says, it had been rolled over into his Merrill Lynch IRA; and that the trial court had inadvertently awarded some of his personal items to the wife. The wife cross-appeals, arguing that she received an inequitable share in the division of the marital property and that she should have been awarded more alimony. The parties' marriage was the wife's second and the husband's third, and no children were born of the marriage. At the time of trial, the wife was 55 years of age and the husband was 75 years of age. The husband has four adult children from his previous marriages, and the wife has two adult daughters from her previous marriage.
The husband and wife met in the wife's native country of Chile in 1983; at that time the wife was 39 years of age and the husband was 59 years of age. The wife was employed as a supervisor of telecommunications in the Chilean Senate, and the *Page 711 
husband was a pilot for Eastern Airlines. The husband retired from Eastern Airlines in March 1984 after 34 years of service when he reached the mandatory retirement age for commercial pilots of 60 years.
The couple began living together in March 1984 in southern Florida, and then moved to Santiago, Chile, in December 1984, where they lived with the wife's then-minor daughters until December 1986. The husband, the wife, and her daughters lived in several different apartments in Chile, and the husband provided most of the support for the wife and her daughters. The husband treated the daughters as his own, and later paid for their college educations. While the husband lived in Chile, he regularly visited his mother in Alabama. In October 1986, he telephoned the wife from Alabama to discuss moving back to the United States because of the instability of the Chilean government, which was then under the rule of Augusto Pinochet. The husband purchased two pieces of property: the marital home in Etowah County and a farm in St. Clair County.[4]
The record does not include the purchase price of either the marital home or the farm; the record does include that at the time the husband purchased the farm, the seller retained a mortgage on the farm in the amount of $285,000.
The deed to the farm was in the name of the husband only, except for 40 acres in the middle of the farm that was transferred by a separate deed that listed the names of both the husband and the wife as grantees. Because of a significant drop in interest rates, the husband refinanced the farm in January 1994. The husband obtained financing from SouthTrust Bank. Because of his age, the type of financing available to him was a five-year note with a balloon payment due at the end of the five-year term. The husband testified that he borrowed more money than he originally owed on the farm in order to consolidate his debts and so that he would have only one payment. The husband testified that he financed either $380,000 or $400,000. The husband testified that he paid off the mortgage on the marital home with some of the moneys he received from the refinancing. At the end of the five-year note term (in February 1999), the husband refinanced the farm for another five-year term. At the time of trial, the farm was subject to a mortgage debt in the amount of $383,000, and it was listed for sale for $1,650,000.
The deed to the marital home was in the husband's name only, but later was amended (in May 1998) to include the wife's name also. The wife testified that the marital home was not encumbered with a mortgage before 1999. In January 1999, the husband mortgaged the marital home as security for a loan in the amount of $140,000. The husband testified that he used some of that money from that loan to pay down the mortgage on the farm, but he also testified that he used the money for other things.[5] The husband testified that the $140,000 had gone toward household expenses, as well as to repay $20,000 to his Merrill Lynch IRA for money he had given to one of the wife's daughters and he gave $22,000 to one of his sons so that he could buy a new car. *Page 712 
The parties were married in Trenton, Georgia, in January 1987; at that time, the wife was 43 years of age and the husband was 63 years of age. After the parties had married, the wife and her two daughters became naturalized citizens of the United States.
The parties began having marital trouble in 1992. The wife left the husband and filed for a divorce the first time in late December 1992 or early January 1993, but the couple reconciled shortly thereafter. The wife left the husband and filed for a divorce three more times over the seven years that followed. The couple reconciled on each occasion except the last, which resulted in the divorce judgment now on appeal to this court. The wife returned to Chile for extended visits during the times of the parties' marital difficulties. In the final divorce petition, the wife alleged physical and emotional abuse,[6] the husband filed a counterclaim, alleging physical, mental, and emotional abuse. The husband claimed that the wife had been neglectful of his needs.
Both the wife and the husband testified about an incident in December 1992 that seems to have precipitated the marriage's decline. Both parties testified that when they retired for the evening on December 23, 1992, they had a disagreement about an investment project in which the husband was considering investing $100,000. Both parties testified that the disagreement turned into a heated argument, and that the husband pushed the wife out of their bed. The husband testified that the wife became hysterical, and that he slapped her in an attempt to calm her down. The husband also testified that when one of the wife's daughters entered the bedroom and also became hysterical, he slapped her, too. The wife testified that she telephoned the local police on the following day, but that she did not press charges and no arrest was made. The wife testified that she tried to put the ordeal behind her because it was Christmas-time, but that she left the marital home several days later, stayed in a local motel for 10 days, and then filed the first divorce complaint. The wife testified that the parties reconciled with the assistance of the wife's son-in-law.
There followed several more heated disagreements and physical altercations between the parties. The husband and the wife both testified that in 1997 the husband pushed the wife out of the car during an argument. The wife testified that she then went to stay with her daughter for a week, and that when she returned to the marital home, she moved into a separate bedroom. The wife also testified that she went to Chile for several weeks at some time during 1997.
In February 1998, the wife had an automobile accident in Birmingham, Alabama, and she was hospitalized for several days. Shortly after she had returned home, one of the wife's daughters caused the wife to be involuntarily committed to a psychiatric unit at a local hospital. The daughter testified that the husband had persuaded her and her husband (the wife's son-in-law) that the wife was mentally unstable. As a result, the relationship between the wife *Page 713 
and both of her daughters became strained; one of the daughters refused to allow the wife to see her new grandchild. The husband testified that he visited the wife at the hospital and brought her home after five days because of the distressing conditions of the hospital. The wife testified that she went to Chile for two to three weeks at some time during 1998. She also testified that she was examined by a psychologist in Chile who determined that she was mentally sound.
While the wife was in Chile, the husband was hospitalized. His health had declined after he was diagnosed with coronary heart disease in January 1996. Two of the husband's children came to Alabama to take care of him and stayed in the parties' home. One of the husband's sons testified that when the wife returned home from Chile, she asked the husband's children to leave, and that when they refused to leave, she telephoned the police. The police came to the house, and the husband (who was physically weak at the time) was forced to deal with the situation and to talk to the police. The son also testified that after the police left, the wife became very upset; the son further testified that when she attempted to leave the house, he and the husband took her keys in an attempt to stop her. The son also testified that the wife struck the husband several times with a flashlight and she eventually left on foot. The wife testified that she stayed at a local motel until the husband's children had left, and then returned to the marital home.
The record also includes evidence of the wife's abusive treatment toward her aging husband. A neighbor of the parties testified that at some time during the early part of 1999, he saw the wife leaning in the husband's car window and hitting the husband on the head while the husband sat behind the steering wheel. When the wife saw the neighbor, she stopped. The husband testified that at some other time during 1999, the wife stuck her fingernail in the husband's neck while they were standing in the buffet line at a local restaurant, causing the husband to turn around and slap her to shake her loose and that the wife had telephoned the police. The police came, but no arrests were made as a result of the incident. The wife left for her last extended visit to Chile in May 1999, where she stayed until the end of July 1999.
At the time of the parties' last separation (in September 1999), the parties were living in the same house, but the husband and the wife were living separate lives. The husband testified that the wife did not prepare meals for him, although he admitted that she did not prevent him from eating. The parties had little interaction, and the husband testified that the wife did not help take care of him in any manner. A few days before the wife filed the final divorce complaint, one of the parties' neighbors testified that he found the husband in the parties' driveway, disoriented. The neighbor testified that he took the husband back to the neighbor's house and fed him and cared for him until one of the husband's sons came from North Carolina the following day. The husband's son testified that he and the husband returned to the martial home to pick up a few personal items for the husband. Both the husband's son and the wife testified that the wife did not know that the husband had spent the night away from home. The son took the husband to Atlanta, Georgia, where the husband was hospitalized for 10 days, suffering from dehydration and malnutrition.
At the time of trial, the husband was receiving approximately $5,015 per month from the Prudential annuity, $1,000 per month in Social Security benefits, and *Page 714 
withdrawals from his Merrill Lynch IRA,[7] which held a total balance of $456,506 (as of December 31, 1999).[8] The balance in the husband and wife's joint Merrill Lynch account as of December 31, 1999 was $70,681, and the husband had a checking account at SouthTrust Bank with a balance of between $3,300 and $4,500. The wife did not work very much during the marriage — only occasionally as a translator, never earning more that $800 per year. The wife testified that her monthly expenses were $2,800 (excluding the mortgage payment on the marital home), but that amount included enough money for her to return to college and then to attend law school.
One of the husband's 1997 Merrill Lynch statements stated that his net worth was $6.1 million. The husband testified that one of his brokers had filled in that amount on the statement without the husband's knowledge, and that the figure was incorrect. No evidence in the record indicates that the husband actually was worth $6.1 million.
The husband and the wife both made several other cash contributions to the marriage. The wife testified that she owned an apartment in Chile, that she sold the apartment at some point between 1984 and 1994, and that she placed the proceeds in a joint bank account. The record does not include the amount of the proceeds from the sale.
The husband and wife sold a rental house in 1996 for $55,000. (The record is unclear whether the rental house was in the name of the husband only or in the name of the husband and wife.) The husband and wife received $47,000 in cash and the husband testified that "we" held a mortgage on the property to secure payment of the balance. The husband testified that the wife asked that the $47,000 be placed in an account in her name only, which the husband did. Several weeks later, she bought the 1997 Maxima automobile for $27,000.
The husband testified that he had also lent the wife's daughters money on various occasions. The husband testified that one of the wife's daughters and her husband owed him $35,000, but he did not submit any documentation to support his claim that this amount was a loan and not a gift.
The husband secured a mortgage loan on the marital home in the amount of $140,000 in January 1999. The wife testified that she objected to the mortgage, but that she ultimately consented to it. As previously stated, the husband testified that the $140,000 had gone toward household expenses, as well as to repay his Merrill Lynch IRA for money he had given to one of the wife's daughters and to *Page 715 
one of his sons so that he could buy a new car. The husband also testified that some of the money went toward paying down the mortgage on the farm. The wife testified that the husband had told her that out of the $140,000 he was going to set up an investment account in her name only in the amount of $120,000, but that she had never seen a penny of the $140,000. The husband testified that at the time the 1999 mortgage was executed, the marital home was appraised at $195,000.
We begin by noting the appropriate standard of review in divorce proceedings. "Trial judges enjoy broad discretion in divorce cases, and their decisions are to be overturned on appeal only when they are `unsupported by the evidence or [are] otherwise palpably wrong.'" Exparte Bland, 796 So.2d 340, 344 (Ala. 2000) (quoting Ex parte Jackson,567 So.2d 867, 868 (Ala. 1990)).
The husband argues on appeal that the trial court erred in awarding the wife one-half of the amount of the C.D. because, he says, the C.D. was nonexistent at the time of the divorce, i.e., he claims that the moneys in the C.D. had been rolled over into his Merrill Lynch IRA. The husband also contends that the trial court violated § 30-2-51, Ala. Code 1975, because, he says, the C.D. was his "separate property" (consisting of contributions he made to an individual retirement account before the parties were married), and, therefore, was not subject to division.
At the trial, the husband and the wife offered conflicting testimony regarding the nature of the CD. The wife testified that the C.D. was purchased with moneys that the parties had made from joint investments. The husband testified that the C.D. was one of his individual retirement accounts, and that he had rolled over the moneys from the C.D. into his Merrill Lynch IRA. A 1997 individual-retirement-account statement from SouthTrust Bank admitted into evidence shows that the moneys were transferred out of the CD. The wife testified that the amount in the Merrill Lynch account[9] had doubled in value one year, which corroborates the husband's testimony that he rolled the moneys from the C.D. over into his Merrill Lynch IRA.
The divorce judgment stated that the wife was awarded $160,179 as alimony in gross and designated from which specific accounts that amount was to be paid to her.[10] Therein lies the problem: the trial court directed that the wife receive $122,688.50[11] of that amount from an account that did not exist at the time of the divorce judgment.
Because the evidence does not support the trial court's finding that a C.D. *Page 716 
existed at the time of the divorce, and the divorce judgment specifically divested the wife of any interest in the husband's Merrill Lynch IRA, the investment vehicle to which the C.D. proceeds have been transferred, we must conclude that those portions of the divorce judgment addressing the division of marital property are inconsistent and ambiguous, and are therefore "palpably wrong." We also reverse the judgment as to the alimony issue, so that the trial court will, on remand, have before it all matters concerning payments between the parties.[12] See Ex parteBland, 796 So.2d at 345 (wherein the Supreme Court held that this court's reversal of a trial court's judgment awarding a wife 25% of a husband's military-retirement benefits was proper in light of remand for a determination of periodic alimony payments, so that in fashioning a new order, the trial court would have before it all matters concerning payments between the parties); see also Willing v. Willing, 655 So.2d 1064
(Ala.Civ.App. 1994) (noting that matters of alimony and property division are interrelated). Factors that the trial court should consider in its award of alimony and its division of property on remand include the earning abilities of the parties; the future prospects of the parties; their ages and health; the duration of the marriage; the parties' station in life; the marital properties and their sources, values, and types; and the conduct of the parties in relation to the marriage. Willing, 655 So.2d at 1067.
The parties make other arguments to this court regarding (1) whether the Merrill Lynch IRA and/or the farm property is marital property and (2) whether the trial court abused its discretion in not awarding to the wife any portion of either of these properties. We note that there appears to be some conflict in the evidence with respect to these issues and that the trial court's judgment does not address these issues. Because we reverse the judgment for the trial court to reconsider its findings as to the appropriate property division and alimony award, we pretermit discussion of those other properties at this time. Accordingly, on remand, the trial court is directed to make findings as to whether either of those properties is marital property and whether a property award should be made to the wife in relation to either or both of those properties. In directing the trial court to make these findings, we do not intend to suggest any particular outcome.
For the foregoing reasons, the judgment of the trial court is due to be reversed, and the cause remanded for the court to reconsider the property division and the alimony award.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Yates, P.J., and Crawley, Thompson, and Pittman, JJ., concur.
[1] The automobiles awarded to the wife were a 1986 BMW, a 1997 Maxima (which the wife previously had given to one of her daughters), and a 1987 Buick Park Avenue.
[2] From our review of the record, we conclude that the trial court arrived at $160,179 as follows: $35,340.50, representing one-half of $70,681 in the joint Merrill Lynch account (as of December 31, 1999); $122,688.50, representing one-half of the $245,377 face amount of the CD; and $2,150, representing one-half of the SouthTrust Bank checking account (the balance of which varied between $3,300 and $4,500).
We note that the husband in his brief on appeal to this court appears to value one-half of the joint Merrill Lynch account and one-half of the SouthTrust checking account at $40,179 (which is an amount slightly higher than this court's calculation of the monetary value of those combined accounts — $35,340.50 + $2,150 = $37,490.50).
[3] The divorce judgment stated that the husband's obligation to pay the mortgage debt terminated upon the wife's remarriage, cohabitation, or either party's death. The divorce judgment further stated that the "[l]iability of the mortgage payment shall not be considered a liability of the [husband's] estate, but only as an incident of support/alimony."
[4] The husband had approximately $350,000 in liquid assets at that time as a result of his second divorce, $240,000 of which had been derived from the sale in 1986 of the marital residence from his second marriage.
[5] The husband's testimony was unclear and confusing at times. For example, when he was testifying about refinancing the farm and the marital home, he would confuse the dates and facts regarding which refinancing he was testifying about.
[6] The wife later amended her complaint to allege that the parties had had a common-law marriage beginning in March 1984. However, the wife's annulment from her first marriage was not final until July 12, 1984, and the husband's divorce from his second wife was not final until late 1985.
Although the wife presented some evidence tending to show that the parties had held themselves out as husband and wife while they lived in Chile and at the time of the purchase of the marital home and the farm, the trial court did not include the date of the marriage in the divorce judgment and it did not specifically address this issue.
[7] The parties' 1997 federal and state income-tax returns (which were the parties' only tax returns that were admitted into evidence) showed that the husband received $10,000 from the C.D. and $10,000 from the Merrill Lynch IRA as taxable IRA distributions in 1997. Those tax returns also showed that the husband received $27,000 in nontaxable distributions, which were amounts the husband testified had been withdrawn from his IRA and rolled back into that account in a timely manner so as to avoid tax consequences.
The parties' 1999 Merrill Lynch year-end statement showed that $40,000 was rolled over into the husband's Merrill Lynch IRA in 1999 and $20,872.34 was distributed to the husband from his Merrill Lynch IRA that year. That statement also showed that $67,000 was distributed to the husband from his Merrill Lynch IRA in 1998.
[8] The wife claims to this court on appeal that the balance in the husband's Merrill Lynch IRA as of December 31, 1999, was $527,187; however, from our review of the 1999 Merrill Lynch year-end statement $527,187 represents the total amount in both the joint account ($70,681) and the husband's IRA ($456,506).
[9] Although there were two separate accounts at Merrill Lynch (the parties' joint account and the husband's IRA), the wife generally referred to them as one account. A graph (reflecting the total value of both accounts) on the parties' 1999 Merrill Lynch year-end statement shows an increase from $258,000 in April 1997 to $536,000 in December 1997.
[10] The divorce judgment did not state whether or not the trial court considered the C.D. to be an investment account (as the wife claimed) or one of the husband's IRAs (as the husband claimed). We do not know whether the trial court intended to award the wife one-half of the C.D. on the mistaken belief that the C.D. was an investment account, or whether the trial court intended to award the wife a portion of the moneys out of one of her husband's IRAs. We also note that it is unclear whether the trial court believed that both a $245,377 C.D. and a $456,506 Merrill Lynch IRA (of the husband's) existed at the time of the trial, or whether the trial court recognized that the moneys from the C.D. had been rolled over into the husband's Merrill Lynch IRA.
[11] $122,688.50 amounts to one-half the amount of the CD. See note 2,supra.
[12] On appeal, the husband argues that the trial court's order mistakenly awards to the wife numerous items of his personal property, including numerous keepsakes accumulated by him during his life before the marriage, the only significant value of which is their sentimental value to the husband. These include such items as the report cards of his children, his own diplomas, his aviation and service records, and his personal embossed Bible, among other things. These items were present in the marital home at the time the trial court awarded each party their personal property in their possession. Upon remand, the trial court will have an opportunity to clarify or correct any misunderstanding as to its intent with respect to these personal-property items. *Page 717